IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| HEAVY IRON OILFIELD SERVICES, L.P., *a Pennsylvania Limited Partnership*,<br>Plaintiff,<br><br>vs.<br><br>MOUNTAIN EQUIPMENT OF NEW MEXICO, INC., *a New Mexico corporation,*<br>Defendant. | Civil Action No. 14-39<br>Magistrate Judge Maureen P. Kelly<br><br>Re: ECF Nos. 52 and 56 |

## OPINION AND ORDER

**KELLY, Chief Magistrate Judge**

Plaintiff Heavy Iron Oilfield Services, L.P. ("Plaintiff") has brought this contract action against Defendant Mountain Equipment of New Mexico, Inc. ("Defendant"), relative to Plaintiff's purchase of equipment from Defendant.

Presently before the Court are cross-motions for Summary Judgment submitted on behalf of the parties. For the reasons that follow, Plaintiff's Motion for Summary Judgment, ECF No. 52, will be denied and Defendant's Motion for Summary Judgment, ECF No. 56, will be granted.

## I.     FACTUAL AND PROCEDURAL BACKGROUND

According to the record, Plaintiff is a Pennsylvania limited partnership that provides oil and gas-related field services equipment for well testing and flow back services. ECF No. 1-3 ¶¶ 1, 5. Defendant is a New Mexico corporation in the business of providing oil and gas-related equipment for well testing and flow back services. Id. ¶¶ 2, 6. In particular, Defendant sells sand traps which protect downstream equipment by removing sand from the well flow in oil and gas extraction. One component of the sand traps is a pressure vessel. Id. ¶¶ 9-10.

The manufacture of the pressure vessels is governed by the American Society of Mechanical Engineers ("ASME"), which is a not-for-profit 501(c)(3) organization that

establishes and revises standards for various engineering applications, including standards for boilers and pressure vessels. ASME standards are found in the Boiler & Pressure Vessel Code ("the ASME Code"). ECF No. 55-6 at 5; ECF No. 64-15 at 3; ECF No. 64-16 at 2. ASME requires a manufacturer of boilers and pressure vessels to obtain a Certificate of Authorization which, in turn, requires a manufacturer to develop a design that demonstrates that the manufacturing will be performed in compliance with the ASME Code. ECF No. 55-6 at 8; ECF No. 64-4 at 2-3. The manufacturing company must also contract with an Authorized Inspection Agency ("AIA") that has been approved by the National Board of Boiler and Pressure Inspectors (the "National Board"), which, like ASME, promulgates rules relative to boilers and pressure vessels; it also trains inspectors. ECF No. 55-6 at 9; ECF No. 64-16 at 3. The AIA is charged with verifying that the manufacturer has been issued a valid Certificate of Authority from ASME and with inspecting the vessels (at least three times) during the manufacturing process to ensure that it is being manufactured as designed and thus in compliance with the ASME Code. ECF No. 55-5 at 7-9; ECF No. 55-6 at 7; ECF No. 64-4 at 3; ECF No. 64-15 at 3-4. Once the manufacturing process is complete and the AIA verifies that the construction is in compliance, the authorized inspector issues a U1A form, which is also executed by the manufacturer, indicating that the vessel is ASME compliant. The U1A form is then filed with the National Board. ECF No. 55-5 at 7-8; ECF No. 55-6 at 6; ECF No. 55-18 at 3. At that juncture, the manufacturer is permitted to adhere the appropriate physical marker or stamp on the vessel to signify that the product complies with the ASME Code. The mark relative to the vessels at issue in this case are called "U Marks." ECF No. 55-1 at 3-4; ECF No. 55-5 at 17; ECF No. 55-6 at 7-9; ECF No. 64-4 at 3-4; ECF No. 64-9 at 13; ECF No. 64-16 at 3-4. See generally Air Products

& Chemicals, Inc. v. Eaton Metal Products Co., No. 02-1277, 2003 WL 22133839, at *3-4 (E.D. Pa. Aug. 22, 2003).

It is undisputed that Wadsworth Industries, LLC ("Wadsworth") is the manufacturer that produced the sand traps at issue in this case and that it held a Certificate of Authorization from ASME from 1999 until 2012. ECF No. 64-5 at 2; ECF No. 64-15 at 5. Wadsworth was thus granted the authority by ASME to stamp the vessels it manufactures with the U Mark after they are independently evaluated by the AIA. The AIA with which Wadsworth contracted to verify its Certificate of Authorization and perform the requisite inspections was OneCIS Insurance Co. ("One CIS").[1] ECF No. 55-5 at 12-13; ECF No. 55-9. With respect to the particular sand traps at issue here, it appears that Wadsworth sent a design drawing to OneCIS for approval in November of 2009, and that the design was found acceptable. ECF No. 55-5 at 14-15; ECF No. 64-15 at 5-6; ECF No. 64-20.

It is also undisputed that in June of 2011, Plaintiff entered into a contract with Defendant for the purchase of two sand traps which Plaintiff and/or its clients required to be ASME certified. ECF No. 55-1 at 4-6, 28; ECF No. 55-11; ECF No. 55-12. The sand traps were delivered to Plaintiff in early August, 2011, with the requisite certifications in that the U1A forms had been executed by Wadsworth and by OneCIS following its various inspections during and after the manufacturing process, and the U Mark had been attached to both vessels. ECF No. 55-1 at 3-4, 29; ECF No. 55-14; ECF No. 55-15; ECF No. 55-17 at 2-5; ECF No. 64-4 at 14-15, 16; ECF No. 64-19.

In December of 2012, Plaintiff contacted Defendant regarding the purchase of two additional sand traps. ECF No. 55-1 at 18-19. As before, Wadsworth and OneCIS signed the

---

[1] It appears that OneCIS was formerly known as OneBeacon American Insurance Co. For purposes of clarity, however, the Court will refer to the company as OneCIS throughout. ECF No. 59-9 at 2.

U1A forms indicating that the design and manufacture of the sand traps conformed to the ASME Code and Wadsworth stamped the vessels with the U Mark. ECF No. 55-17 at 6-9. Although not entirely clear, it appears that the second set of sand traps was delivered to Plaintiff in late December 2012.[2]

In the interim, beginning in June of 2012, questions surrounding Wadsworth's certifications and whether the vessels it was manufacturing were ASME compliant began to surface and allegations of non-compliance were lodged against Wadsworth by OneCIS, the National Board and ASME. ECF No. 55-19; ECF Nos. 55-21 through 55-26. Wadsworth, who continues to defend its design and the manufacturing process, was ultimately contacted by ASME on December 7, 2012, and given until January 31, 2013, to respond to the allegations. ECF No. 55-27; ECF No. 55-33; ECF No. 55-50 at 4-24; ECF No. 64-13 at 6; ECF No. 64-15 at 9, 12-15. In the event that Wadsworth did not dispute the allegations, it was advised to submit a corrective action plan by that date. Id. Wadsworth responded to the allegations on January 31, 2013, and, although it indicated that it would work with OneCIS to rectify the situation, it appears that Wadsworth eventually abandoned those efforts and, on August 1, 2013, notified OneCIS that it had discontinued manufacturing the pressure vessels altogether, ECF No. 55-28; ECF No. 55-39, and returned its Certificate of Authorization and the ASME stamp. ECF No. 55-5 at 31; ECF No. 55-39; ECF No. 55-41. In October of 2013, various notices and/or alerts were sent by ASME and the Alberta Boiler Safety Association ("ABSA"), Canada's equivalent of ASME, to the relevant authorities advising that Wadsworth vessels were not compliant with the

---

[2] It appears that the second set of sand traps that Defendant sold to Plaintiff were refurbished traps that had actually been manufactured in 2011 and had been inspected and marked at that time. Thus, the U1A forms relative to those sand traps are dated 12/27/11, and reflect an inspection date of 11/9/11. ECF No. 55-1 at 19-20; ECF No. 55-17 at 6, 8; ECF No. 59-9 at 2; ECF No. 64-4 at 8.

ASME Code and that all markings should be removed from those vessels. ECF No. 55-42; ECF No. 55-43; ECF Nos. 55-45 through 55-47.

Plaintiff filed the instant Complaint on December 10, 2013, in the Court of Common Pleas of Allegheny, Pennsylvania, and on January 8, 2014, Defendant removed the case to this Court based on diversity.[3] See ECF No. 1. Plaintiff brings claims against Defendant for breach of contract (Count I); breach of express warranty (Count II); breach of the implied warranty of merchantability (Count III); and breach of implied warrant of fitness for a particular purpose (Count IV). ECF No. 1-3.

On June 1, 2015, Plaintiff filed a Partial Motion for Summary Judgment arguing that it is entitled to summary judgment as to the first three Counts of the Complaint. ECF No. 52. Defendant filed a Memorandum in Response and Opposition to Plaintiff's Motion on July 1, 2016. ECF No. 60. Plaintiff filed a Reply Brief on July 15, 2015, and on July 28, 2015, Defendant filed a Sur-Reply. ECF Nos. 67, 71. Defendant also filed a Motion for Summary Judgment on June 1, 2015, seeking judgment in its favor on all four Counts of the Complaint. ECF No. 56. Plaintiff responded in kind on July 1, 2015. ECF No. 62. Defendant filed a Reply Brief on July 15, 2015, and Plaintiff filed a Sur-Reply on July 28, 2015. ECF Nos. 69, 70. Accordingly, both Plaintiff's Motion for Partial Summary Judgment and Defendant's Motion for Summary Judgment are ripe for review.

## II. STANDARD OF REVIEW

Rule 56 of the Federal Rules of Civil Procedure provides that: "The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact

---

[3] It is undisputed that Plaintiff is a Pennsylvania Limited Partnership with its principal place of business in McDonald, Pennsylvania, and Defendant is a New Mexico corporation with its principal place of business in Albuquerque, New Mexico. ECF No. 1 ¶¶ 1, 6-10; ECF No. 1-3 ¶¶ 1, 2. It is also undisputed that the amount in controversy exceeds the requisite $75,000.00 threshold. ECF No. 1 ¶¶ 12-15; ECF No. 1-3 ¶ 13.

and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). An issue of material fact is in genuine dispute if the evidence is such that a reasonable jury could return a verdict for the nonmoving party. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986). See Doe v. Abington Friends Sch., 480 F.3d 252, 256 (3d Cir. 2007) ("A genuine issue is present when a reasonable trier of fact, viewing all of the record evidence, could rationally find in favor of the non-moving party in light of his burden of proof"). Thus, summary judgment is warranted where, "after adequate time for discovery and upon motion . . . a party . . . fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." Marten v. Godwin, 499 F.3d 290, 295 (3d Cir. 2007), *quoting* Celotex Corp. v. Catrett, 477 U.S. 317, 322-23 (1986).

The moving party bears the initial burden of demonstrating to the court that there is an absence of evidence to support the non-moving party's case. Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986). See Conoshenti v. Pub. Serv. Elec. & Gas Co., 364 F.3d 135, 140 (3d Cir. 2004). "[W]hen the moving party has carried its burden under Rule 56(c), its opponent must do more than simply show that there is some metaphysical doubt as to the material facts . . . . Where the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no genuine issue for trial." Scott v. Harris, 550 U.S. 372, 380 (2007), *quoting* Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586-87 (1986).

In deciding a summary judgment motion, a court must view the facts in the light most favorable to the nonmoving party and must draw all reasonable inferences, and resolve all doubts in favor of the nonmoving party. Matreale v. New Jersey Dep't of Military & Veterans Affairs, 487 F.3d 150, 152 (3d Cir. 2007); Woodside v. Sch. Dist. of Phila. Bd. of Educ., 248 F.3d 129, 130 (3d Cir. 2001).

### III. DISCUSSION

#### A. Breach of Contract

Under Pennsylvania law, in order to prevail on a breach of contract claim, "a plaintiff must demonstrate (1) the existence of a contract, including its essential terms, (2) a breach of a duty imposed by the contract, and (3) resultant damages." Haywood v. Univ. of Pittsburgh, 976 F. Supp. 2d 606, 625 (W.D. Pa. 2013), *citing* Ware v. Rodale Press, Inc., 322 F.3d 218, 225 (3d Cir. 2003).[4]

Plaintiff argues that Defendant had a duty to provide it with ASME certified and compliant sand traps and that, because ASME, the National Board, OneCIS and the ABSA subsequently determined that the traps at issue did not comply with ASME standards, Defendant breached its contractual duty. To support its position, Plaintiff points to Defendant's website in which it advises potential clients to avoid purchasing equipment without the proper ASME certification. ECF No. 55-10. Plaintiff also points to the sales quotation drafted on June 1, 2011, by Michael Ceranski, who negotiated the sale on behalf of Defendant, which indicates that the sand traps would be ASME certified, as well as the invoices for the traps which refer to "ASME" and either "Nat'l Bd. registered" or simply "NB." ECF No. 55-11; ECF No. 55-12; ECF No. 55-29; ECF No. 64-1. Plaintiff also relies on the deposition testimony of John Van Slyke, who negotiated the sale on Plaintiff's behalf, in which he states that Mr. Ceranski told him that the sand traps would be ASME certified and that he believed he was purchasing ASME certified sand traps. ECF No. 55-1 at 17, 19, 25, 28; ECF No. 64-4 at 7, 15.

This evidence, however, shows only that Plaintiff bargained for, and Defendant agreed to provide, traps that were ASME *certified*. Not only did Mr. Van Slyke repeatedly testify at his

---

[4] The parties have both cited to and/or relied on Pennsylvania law and thus do not dispute that Pennsylvania law governs the instant action.

deposition that he bargained only for ASME *certification* but, in its Brief filed in support of its Motion for Summary Judgment, Plaintiff itself describes the evidence upon which it relies as showing a promise by Defendant to provide traps that were ASME *certified*. Id.; ECF No. 53 at 14-15, 19.[5]

Further, Defendant has argued and provided evidence that "ASME" and "ASME certified" are terms of art in the industry and mean that a company, which ASME has authorized to stamp its equipment with the appropriate mark -- in this case a "U Mark" or "U stamp" -- indicating that it complies with ASME Code, has, in fact, stamped the equipment accordingly and that an AIA, commissioned by the National Board, has provided the appropriate inspection services to verify that the applicable design calculations have been followed and has issued a U1A form. ECF Nos. 58 at 3-7; ECF No. 60 at 16-19. Plaintiff does not dispute that the sand traps at issue not only bore the U stamp but that OneCIS, the AIA, had issued the requisite U1A forms thereby verifying that the applicable and approved design had been followed. ECF No. 64-4 at 14-15, 16; ECF No. 64-5 at 4; ECF No. 64-9 at 11.[6] The sand traps therefore were ASME certified at the time they were delivered to Plaintiff.

Importantly, Plaintiff has not addressed Defendant's argument regarding the meaning of "ASME certified" as it is used in the trade and does not offer any evidence to the contrary. Rather, Plaintiff appears to ignore the distinction between ASME certification and ASME compliance thereby suggesting that they are one in the same.[7] Clearly they are not. To find

---

[5] In addition, although not particularly relevant, Defendant's website states only that Defendant specializes in "ASME . . . *certified* equipment." ECF No. 55-4.

[6] All four vessels at issue were inspected by Don Taylor who, at the time, had worked for OneCIS as an Authorized Inspector for ten years. ECF No. 64-13 at 2.

[7] Plaintiff also argues that its evidence shows that it bargained for "ASME assertion," which it describes as recognition by ASME that the traps were ASME compliant. As Defendant has argued, however, ASME itself does not recognize or assert anything relative to the manufacture, inspection or certification of the equipment it governs.

8

otherwise would impose a duty on Defendant to re-inspect the traps it receives from Wadsworth -- traps that have already been inspected by the very parties that ASME and the National Board have designated to verify that the traps comply with ASME code. Not only would placing such a burden on Defendant render the inspections performed by ASME authorized agents superfluous but it is not an obligation that Defendant promised or that Plaintiff bargained for.[8] See De Lage Landen Fin. Servs., Inc. v. Miramax Film Corp., No. 06-2319, 2008 WL 4348074, at *9 (E.D. Pa. Sept. 23, 2008), *citing* Brisbin v. Superior Valve Co., 398 F.3d 279, 293 (3d Cir. 2005) ("[f]or a contract to be valid and binding, the parties must manifest mutual assent-that is, a meeting of the minds on the contract's essential terms"). Indeed, Mr. Van Slyke's testimony shows that Plaintiff was well aware of the certification process and thus understood that the certification would be provided by parties other that Defendant and that no one from Defendant would be inspecting the sand traps to verify compliance with ASME Code. Rather, Defendant, like Plaintiff, would be relying on the certifications by those who were designated to perform them. Cf. Commercializadora Portimex, S.A. de C.V. v. Zen-Noh Grain Corp., No. 02-1185, 2002 WL 31040167, at *6 (E.D. La. Sept. 12, 2002) (finding that where the parties agreed that an independent third party would test and certify the quality of the [product], the parties were bound by those certified results); Questrom v. Federated Dep't Stores, Inc., 41 F. Supp. 2d 294, 300 (S.D.N.Y. 1999), *aff'd*, 2 F. App'x 81 (2d Cir. 2001) (finding that "[c]ontracts conditioning the duties of the contracting parties upon approvals of third parties long have been common in

---

Rather, as discussed above, and as Mr. Van Slyke testified, ASME merely certifies manufacturing companies to mark the equipment they produce as meeting the requirements of the ASME Code. ECF No. 64-4 at 2-3. It does not itself inspect, mark or certify any equipment. ECF No. 55-6 at 9; ECF No. 64-16 at 5; ECF No. 64-4 at 3.

[8] Moreover, there is no evidence that Defendant has ASME certification or that it is an authorized inspector. Thus, even if Defendant had re-inspected the sand traps for ASME compliance when it received them from Wadsworth, it would unlikely have come to a different conclusion as the design had been ASME approved in 2009 and it had not yet been unequivocally determined that that approval was unwarranted or that the certifications based on that approval were invalid. See ECF No. 55-5 at 14-15; ECF No. 65-15 at 5-6; ECF No. 64-20.

9

the commercial world," and that the employment agreement at issue left little doubt that the parties intended to be bound by the investment banker's valuation).[9] Thus, the evidence of record, even viewed in a light most favorable to Plaintiff, shows not only that Defendant promised, and Plaintiff bargained only for, traps that were ASME certified, but that ASME certified traps were precisely what Defendant provided and what Plaintiff received. ECF No. 55-17. It therefore follows that Defendant fulfilled its duty under the terms of the contract and thus no fact finder could reasonably conclude that Defendant breached its obligations to Plaintiff.[10] Defendant's Motion for Summary Judgment therefore is properly granted as to Plaintiff's claim for breach of contract brought at Count I of the Complaint.

### 2. Breach of Express Warranty

The Uniform Commercial Code provides that:

> (1) [a]ny affirmation of fact or promise made by the seller to the buyer which relates to the goods and becomes part of the basis of the bargain creates an express warranty that the goods shall conform to the affirmation or promise.
>
> (2) Any description of the goods which is made a part of the basis of the bargain creates an express warranty that the goods shall conform to the description.

13 Pa. Cons. Stat. § 2313(a). Thus, in order for Plaintiff to succeed on its claim for breach of express warranty, Plaintiff must prove that Defendant made an affirmation of fact or promise relating to the sand traps, which became part of the basis of the bargain between the parties, and

---

[9] In this manner, Draft Systems, Inc. v. Rimar Mfg., Inc., 524 F. Supp. 1049 (E.D. Pa. 1981), upon which Plaintiff relies is easily distinguishable in that the defendant-manufacturer itself, and not a third party, provided the certification that the nylon tubing at issue was the appropriate grade.

[10] The other arguments and evidence offered by Plaintiff in support of its position do not serve to create an issue of material fact as they revolve around the decertification of the traps which occurred after the sales at issue and the extent of Defendant's knowledge prior to the sales that Wadsworth's certifications were being questioned. Plaintiff's assertions, however, do not speak to the narrow issue before the Court, namely, what were the agreed upon terms of the contract between the parties at the time it was entered into.

that the product did not conform to the affirmation or promise. "In creating an express warranty, it is not necessary that a seller 'use formal words such as "warrant" or "guarantee" or that he have a specific intention to make a warranty.'" Cnty. of Mercer v. UniLect Corp., 612 F. Supp. 2d 638, 644 (W.D. Pa. 2009), *aff'd*, 381 F. App'x 156 (3d Cir. 2010), *quoting* 13 Pa. Cons. Stat. § 2313(b).

Here, the affirmation of fact and/or the promise upon which Plaintiff bases its claim for breach of express warranty is that the sand traps would be ASME certified. As already found, the sand traps were ASME certified when they were delivered to Plaintiff. Cf. id. at 645-46 (noting that under the Uniform Commercial Code, "the breach of an express warranty occurs on the date the good is delivered, unless the warranty explicitly extended to future performance, and concluding that the warranty at issue only warranted that the machine would comply with Pennsylvania specifications *on the date of delivery*") (emphasis in original). The sand traps therefore conformed to the promise made by Defendant when they were delivered and thus Defendant cannot be found to have breached the warranty. Accordingly, Defendant is entitled to summary judgment on Plaintiff's breach of express warranty claim brought at Count II of the Complaint.

### 3. Breach of Implied Warranties[11]

"Both the implied warranty of merchantability and the warranty of fitness for a particular purpose arise by operation of law and serve to protect buyers from loss where the goods purchased are below commercial standards or are unfit for the buyer's purpose." Altronics of

---

[11] Although Plaintiff seek summary judgment only as to its claim for breach of the implied warranty of merchantability and not on its claim for breach of implied warranty of fitness for a particular purpose, Defendant has placed both implied warranty claims at issue.

11

Bethlehem, Inc. v. Repco, Inc., 957 F.2d 1102, 1105 (3d Cir. 1992). The Uniform Commercial Code provides that:

> a warranty that the goods shall be merchantable is implied in a contract for their sale if the seller is a merchant with respect to goods of that kind. . . .
>
> **(b) Merchantability standards for goods.**--Goods to be merchantable must be at least such as:
>
> (1) pass without objection in the trade under the contract description;
>
> \* \* \*
>
> (3) are fit for the ordinary purposes for which such goods are used . . . .

13 Pa. Cons. Stat. § 2314. Thus, "[i]n order to be merchantable, goods must be "fit for the ordinary purposes for which such goods are used." Altronics of Bethlehem, Inc. v. Repco, Inc., 957 F.2d at 1105, *quoting* 13 Pa. C.S.A. § 2314(b) (3). "The standard . . . does not require that goods be outstanding or superior. It is only necessary that they be of reasonable quality within expected variations and fit for the ordinary purposes for which they are used." Sessa v. Riegle, 427 F. Supp. 760, 769 (E.D. Pa. 1977), *aff'd*, 568 F.2d 770 (3d Cir. 1978).

The Uniform Commercial Code also provides that:

> Where the seller at the time of contracting has reason to know any particular purpose for which the goods are required and that the buyer is relying on the seller's skill or judgment to select or furnish suitable goods, there is unless excluded or modified under the next section an implied warranty that the goods shall be fit for such purpose.

13 Pa. Cons. Stat. § 2315. See Sessa v. Riegle, 427 F. Supp. at 770, n.20. Thus, "[t]he warranty of fitness for a particular purpose is more exacting. It requires that the seller had reason to know of the buyer's particular purpose at the time of contracting and that the buyer was relying on the seller's expertise. In that case, the goods are implicitly warranted to be fit for that particular purpose." Altronics of Bethlehem, Inc. v. Repco, Inc., 957 F.2d at 1105. To establish a breach of either warranty, however, a plaintiff must establish that the equipment that it purchased from

12

defendant was defective. See Pritchard v. Liggett & Myers Tobacco Co., 295 F.2d 292, 296 (3d Cir. 1961) ("[u[nder a warranty of fitness for a particular use, the seller warrants that the goods sold are suitable for the special purpose of the buyer, while a warranty of merchantability is that the goods are reasonably fit for the general purposes for which they are sold"). See also Stephenson v. Sunbeam Products, Inc., 545 F. Supp. 2d 498, 506 (W.D. Pa. 2008) ("causation plays a role in this breach of warranty claim as well").

In this case, although Plaintiff likens the determination that the sand traps were improperly certified when they were received to a latent defect, it simultaneously argues that the sand traps could not have passed without objection in the trade under the contract description because they were not ASME certified when they took possession of the traps. See Garner's BLACK'S LAW DICTIONARY, p. 508 (10th ed. 2014) (defining a latent or hidden defect as "[a] product imperfection that is not discoverable by reasonable inspection . . ."). As already found, however, at the time the traps left Defendant's possession, they were ASME certified and thus not only *could* pass without objection in the trade but *did* pass inspection without objection. Indeed, contrary to Plaintiff's assertion that no insurance company would view the traps as ASME certified or compliant, the record shows that the traps were, in fact, viewed as ASME certified (and thus ASME compliant) by OneCIS -- a designated AIA. The traps therefore were not "defective" and thus were merchantable at the time they were delivered to Plaintiff. The fact that actions and events transpired after the traps were delivered which caused the certifications to be called into question does not render the traps un-merchantable or unfit for their ordinary purpose when they were delivered to Plaintiff. See Comment to Uniform Commercial Code, 13 Pa. Cons. Stat. § 2314 ("an affirmative showing by the seller that the loss resulted from some action or event following his own delivery of the good can operate as a defense"). See also

Sessa v. Riegle, 427 F. Supp. at 770 (finding that even with intermittent claudication, the race horse purchased from the defendant was reasonably fit for the ordinary purposes for which race horses are used, and thus was merchantable, as the condition "did not prevent him from becoming a creditable if unspectacular race horse").[12]

In addition, there is no evidence of record that Plaintiff was purchasing the sand traps for a particular purpose (as opposed to their ordinary purpose). Nor is there evidence that Defendant was aware of Plaintiff's reasons for purchasing the sand traps or any particular use for which Plaintiff needed them. Moreover, Mr. Van Slyke testified that he did not seek, nor did Defendant provide, any advice or particular expertise relative to the traps and thus did not rely on any such advice when it purchased the sand traps. ECF No. 55-1 at 26-27. Under these circumstances, it cannot be concluded that Defendant breached an implied warranty of fitness for a particular purpose.

Finally, to the extent that Plaintiff alleges that Defendant breached the implied warranty of good faith and fair dealing, its claim also fails. In Pennsylvania, a covenant of good faith and fair dealing is implied in every contract. Lyon Fin. Servs., Inc. v. Woodlake Imaging, LLC, No. 04-3334, 2005 WL 331695, at *8 (E.D. Pa. Feb. 9, 2005). Pennsylvania law, however, does not recognize an independent claim for breach of the implied covenant of good faith and fair dealing. Id. Rather, a claim for the breach of the covenant of good faith and fair dealing is subsumed in the breach of contract claim. McHolme/Waynesburg, LLC v. Wal-Mart Real Estate Bus. Trust, No. 08-961, 2009 WL 1292808, at *2 (W.D. Pa. May 7, 2009), quoting Commonwealth v. BASF Corp., No. 3127, 2001 WL 1807788, at *12 (Pa. Com. Pl. Mar. 15, 2001) ("Pennsylvania law

---

[12] Although Defendant argues that in order to find that a product is defective there must be evidence that it malfunctioned or otherwise did not perform properly -- a proposition that Plaintiff disputes -- the Court need not address the issue having found that the sand traps were ASME certified and thus not defective even under Plaintiff's theory.

14

does not allow for a separate cause of action for breach of either an express or implied duty of good faith, absent a breach of the underlying contract"). Because the Court has found that Plaintiff is unable to sustain its claim for breach of contract, it follows that it is unable to succeed on its claim for breach of the implied covenant of good faith and fair dealing.

Because Plaintiff has failed to demonstrate that a material issue of fact exists with relative to its claims for breach of implied warranties, Defendant is entitled to summary judgment on those claims brought at Counts III and IV as well.

## IV. CONCLUSION

For the foregoing reasons, Plaintiff's Motion for Partial Summary Judgment is properly denied and Defendant's Motion for Summary Judgment is properly granted. Accordingly, the following Order is entered:

## **ORDER**

AND NOW, this 11th day of March, 2016, upon careful consideration of the parties cross Motions for Summary Judgment, the parties respective Responses, Replies and Sur-Replies, IT IS HEREBY ORDERED that Plaintiff's Motion for Summary Judgment, ECF No. 52, is DENIED, and Defendant's Motion for Summary Judgment, ECF No. 56, is GRANTED.

IT IS FURTHER ORDERED that, pursuant to Rule 4(a)(1) of the Federal Rules of Appellate Procedure, if any party wishes to appeal from this Order he or she must do so within thirty (30) days by filing a notice of appeal as provided in Rule 3, Fed. R. App. P., with the Clerk of Court, United States District Court, 700 Grant Street, Room 3110, Pittsburgh, PA 15219.

BY THE COURT:

/s/ Maureen P. Kelly
MAUREEN P. KELLY
CHIEF UNITED STATES MAGISTRATE JUDGE

cc: All Counsel of Record Via CM-ECF